UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CYTOSPORT, INC.

        Plaintiff,

    v.

VITAL PHARMACEUTICALS, INC.,

        Defendant.

NO. CIV. S-08-2632 FCD/GGH

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

Plaintiff CytoSport, Inc. ("plaintiff" or "CS") brings this action against Vital Pharmaceuticals, Inc. ("defendant" or "VPX") for trademark and trade dress infringement, unfair competition and false advertising under federal and state law. (Second Am. Compl., filed Mar. 19, 2009.) This matter is before the court on plaintiff's motion for preliminary injunction, enjoining VPX from marketing, selling, advertising or promoting a liquid protein-based nutritional supplement using the name MUSCLE POWER® or any other trademark confusingly similar to plaintiff's MUSCLE MILK® trademark. Plaintiff also seeks to enjoin VPX, in conjunction with these activities, from using a trade dress that is

1

confusingly similar to the trade dress associated with MUSCLE

MILK.  VPX opposes the motion, arguing its registered MUSCLE

POWER® trademark does not infringe plaintiff's MUSCLE MILK®

trademark, which is a weak, descriptive mark, and VPX's MUSCLE

POWER trade dress does not infringe plaintiff's MUSCLE MILK trade

dress since the two trade dresses have numerous, specific

differences in both color and layout, and VPX has been using its

dress trade consistently across all its product lines for almost

ten years.

The court heard oral argument on the motion on May 1, 2009.

By this order, it now renders its decision on the motion.  For

the reasons set forth below, plaintiff's motion for preliminary

injunction is GRANTED.  Plaintiff has demonstrated a reasonable

likelihood of success in demonstrating that defendant's use of

its MUSCLE POWER® trademark and trade dress infringes plaintiff's

MUSCLE MILK® trademark and trade dress, that plaintiff is likely

to sustain irreparable harm to its reputation and customer

goodwill absent preliminary relief, the balance of equities tips

in plaintiff's favor in light of its longstanding reputation in

the community and use of the MUSCLE MILK® trademark, and the

public is served by issuance of the requested injunction which

seeks to avoid customer confusion in the marketplace and permits

plaintiff to control its products' reputation.

## BACKGROUND

This is a trademark and trade dress infringement action in

which plaintiff seeks to enjoin defendant from further marketing

and selling a nutritional supplement beverage due to defendant's

alleged infringement of plaintiff's trademark and trade dress.

2

Plaintiff is in the business of manufacturing and marketing various nutritional and dietary supplement products. (Pl.'s Mem. of P. & A. in Supp. of PI Motion ["PI"], filed March 2, 2009, ¶ 1; Declaration of Roberta White ["White Decl."], filed March 13, 2009, ¶ 4.) In addition to a powdered nutritional supplement designed to be mixed in beverages, plaintiff offers a premixed, ready-to-drink ("RTD") liquid protein product sold in connection with the MUSCLE MILK® trademark. (PI, ¶ 2.) Plaintiff distributes its MUSCLE MILK® products through specialty health and nutrition stores, grocery chains, convenience stores, and warehouse outlet stores, and plaintiff maintains its RTD nutritional product is the best-selling RTD nutritional beverage on the market. (Id. at ¶¶ 3-4; White Decl., ¶ 7.) Plaintiff holds three trademark rights to the mark MUSCLE MILK®, including (1) use of the mark in connection with "powdered nutritional supplement[s] containing milk derived ingredients for adding to food and drink," (2) use of the mark in connection with "meal replacement drinks; meal replacement and dietary supplement drink mixes; protein based, nutrient-dense meal replacement bars; and pre-mixed nutritionally fortified beverages," and (3) use of the mark in connection with "nutritional supplements." (PI, ¶¶ 5-7.)

Defendant was founded over fifteen years ago and is also in the business of manufacturing and marketing various nutritional and dietary supplement products. (Declaration of John Owoc ["Owoc Decl."], filed under seal April 16, 2009, ¶ 3.) Similar to many companies in the nutritional supplement market, defendant produces and sells an RTD nutritional product. (Id. at ¶¶ 4-5.) Both plaintiff's and defendant's products are sold in liquid

3

form, are used as nutritional supplements, and promote themselves as lactose free and capable of producing lean muscle. (PI, ¶¶ 25-26.) Defendant asserts it designed its RTD product as the most nutritious on the market and has gone to great lengths to distinguish its formula from that of its competitors. (Owoc Decl., ¶¶ 6-7.)

Defendant designated its RTD nutritional product MUSCLE POWER, which was approved and registered in December 2008 without objection by the Patent and Trademark Office ("PTO") and without opposition by third parties. (Id. at ¶ 9.) Defendant had to disclaim any rights to the word "Muscle," as defendant asserts there are currently forty-two nutritional supplement products, as well as eleven nutritional supplement companies, that employ the word "Muscle" in their name. (Id. at ¶ 10.)

Since at least November 2004, plaintiff's RTD nutritional product has been sold in packaging manufactured and designed by Tetra Pak in an octagonal shape. (PI, ¶ 8.) Its Tetra Pak RTD nutritional product is generally sold in seventeen fluid ounce servings and retails from between $3.00 and $5.00. (Id.) Plaintiff's RTD nutritional product is also sold in an hourglass-shaped plastic bottle in fourteen fluid ounce servings and retails from between $3.00 and $5.00. (Id. at ¶ 9.)

Plaintiff has used a consistent look and feel in the promotion and sale of all of its MUSCLE MILK® products, including its MUSCLE MILK® RTD nutritional product, MUSCLE MILK® powder, MUSCLE MILK® Light, MUSCLE MILK® Pudding, and MUSCLE MILK® Bars, which plaintiff asserts has resulted in significant trade dress rights associated with the MUSCLE MILK® mark. (Id. at ¶ 10;

4

White Decl., ¶ 14.) As a result of its consistent and exclusive use of its trade dress for MUSCLE MILK® products, plaintiff contends its customers have come to recognize plaintiff's trade dress as a source identifier of Muscle Milk products. (PI, ¶ 11; Declaration of Jerry Reda ["Reda Decl."], filed March 13, 2009, ¶ 6.)

Over the course of the last several years, plaintiff has spent well over $100 million dollars promoting the MUSCLE MILK® brand in general, including tens of millions of dollars specifically promoting its RTD nutritional product. (PI, ¶ 14; White Decl., ¶ 23.) Plaintiff promotes and advertises its products through a variety of channels, including over the Internet, through magazines and trade publications, at trade shows, sporting events, bodybuilding competitions, retail store promotional displays and other media outlets. (PI, ¶ 16; White Decl., ¶ 24.) Further, plaintiff's MUSCLE MILK® product is endorsed by a wide variety of well-known athletes, including Jerry Rice. (PI, ¶ 17.) Typical consumers of MUSCLE MILK products include bodybuilders, athletes, and others generally interested in physical fitness, health, and nutrition. (Id. at ¶ 18.)

Plaintiff's trade dress for its Tetra Pak RTD nutritional product contains a number of distinctive components, including: (1) the package is visually divided into three sections: top, middle, and bottom; (2) on the middle portion of the package, the word MUSCLE is prominently displayed above the word MILK in capital letters in a bold, block-letter, white font on a dark background; (3) on the lower portion of the package there is a

colored swirl that reflects the flavor of the liquid in the package; (4) on the top portion of the package the flavor of the product is identified; and (5) on the side of the package, the words MUSCLE MILK are printed in bold, block-letter font and oriented from top to bottom. (Id. at ¶ 12; White Decl., ¶ 22.) Plaintiff's RTD nutritional product manufactured in the hourglass-shaped plastic bottle contains all of the above elements, as well as two more identifying features: (1) on the front of the hourglass bottle, the words MUSCLE MILK are tapered in the shape of the hourglass; and (2) the hourglass bottle includes a rippled design in the plastic of the bottle. (PI, ¶ 13; White Decl., ¶ 22.)

Defendant's RTD nutritional product is also sold in Tetra Pak packaging designed in an octagonal shape. (Owoc Decl., ¶ 12.) However, defendant notes that many of its competitors in the nutritional supplement industry manufacture their RTD products in the Tetra Pak packaging. (Id. at ¶ 11.) Defendant contends that companies do not choose the Tetra Pak packaging simply to copy one another, but because few types of packaging have been approved for RTD nutritional products by the Food and Drug Administration ("FDA"). (Id. at ¶¶ 11-12.) The pre-approved packaging choices for RTD nutritional products include a plastic "snowman" bottle, a plastic "milk-shaped" bottle, the Tetra Pak package, and aluminum cans. (Id. at ¶ 12.) Due to market conditions, defendant could not manufacture its RTD product in the "snowman" or "milk-shaped" plastic bottles, and due to defendant's dislike of aluminum cans, it decided to use the Tetra Pak package. (Id.) Presently, defendant only uses the

6

Tetra Pak package for its MUSCLE POWER® RTD nutritional product. (*Id.*)

Since 1999, defendant asserts it has spent tens of millions of dollars advertising its nutritional supplement products with its trade dress. (*Id.* at ¶ 16.) However, defendant maintains that the Tetra Pak package does not leave many creative options as to the placement of graphics, product name, company logo, etc. (*Id.* at ¶ 20.) While there is only a three-inch horizontal space in which to display the entire logo on the Tetra Pak packaging, defendant has made a point to use the same trade dress on its RTD nutritional product as it uses on its other supplement products. (*Id.* at ¶¶ 20-21.) Specifically, defendant's RTD nutritional product contains a cobalt blue label and packaging; the words MUSCLE POWER in bold, white block letters, which are outlined in red with a black offset drop shadow around that outline; a splash, which is colored to depict the flavor of the liquid; the product name MUSCLE POWER on the side of the package in block lettering; and the amount of protein contained in the package written in bold, white block letters. (*Id.* at ¶ 23.)

Plaintiff contends that defendant's RTD nutritional product contains a number of components that are strikingly similar to plaintiff's product, including (1) the package is visually divided into three sections: top, middle, and bottom; (2) on the middle portion of the package, the word MUSCLE is prominently displayed above the word POWER in capital letters in bold, block-letter, white font on a dark background; (3) on the lower portion of the package there is a colored swirl that reflects the color and flavor of the liquid in the package; (4) on the top portion

7

of the package the flavor of the product is identified; and (5) on the side of the package, the words MUSCLE POWER are printed in bold, block-letter font and oriented from top to bottom. (PI, ¶ 29.) Further, plaintiff emphasizes that although defendant previously labeled many of its various supplement products with vertical writing, defendant departed from this practice and employed horizontal block lettering, similar to plaintiff, for its RTD nutritional product. (Bettilyon Declaration ["Bettilyon Decl."], filed *under seal* April 27, 2009, Exhibit T.) Moreover, plaintiff alleges that although there are numerous design options a company can employ in the design of their Tetra Pak package, defendant chose to use the same basic design as plaintiff for their RTD nutritional product. (Id. at Exs. H-I; White Decl., Ex. I.)

However, defendant asserts that product names, throughout all industries, are commonly printed in block letter font in a dark or light color against a contrasting background, which makes the product name prominent and easy to read. (Owoc Decl., ¶ 24.) Likewise, defendant contends that it is common in the nutritional supplement industry to use a color to reflect the flavor of the product and to print the product name on the side of the package in bold, block letter font. (Id. at ¶¶ 25-26.)

Plaintiff's and defendant's RTD products are sold to an identical class of consumers and through similar channels of trade, including over the Internet, through gyms, and through health and convenience stores. (PI, ¶ 33.) In many instances, plaintiff's and defendant's RTD products are likely displayed

side-by-side on the Internet and on store shelves. (Id. at ¶ 34.)

Due to the similarity of defendant's RTD product, plaintiff indicates that customers have contacted plaintiff with questions and comments evidencing customer confusion in the marketplace. (Id. at ¶ 35; Declaration of Christopher Maun ["Maun Decl."], filed March 13, 2009, ¶¶ 3-6.) For example, one customer contacted plaintiff to complain that he did not like the new formula for plaintiff's RTD product; however, the customer had actually purchased defendant's RTD product and mistaken it for plaintiff's product. (PI, ¶ 36; Maun Decl., ¶¶ 3-6.) Plaintiff also explains that Jerry Reda, an experienced beverage distributor, believed that defendant's RTD product was manufactured by plaintiff. (PI, ¶¶ 37-39; Reda Decl., ¶ 6.) Additionally, plaintiff emphasizes that during a recent beverage trade show, several owners of 7-Eleven stores expressed confusion regarding the origin and source of the MUSCLE POWER product. (Bettilyon Decl., Ex. C [White Dep.] at 28:19-25.) Plaintiff also asserts that one of its employees encountered a customer in a 7-Eleven store who confused defendant's product with that of plaintiff's. (Bettilyon Decl., Ex. D [Blair Decl.] at ¶¶ 4-19.) Finally, plaintiff submits an email it received from a customer, complaining that defendant's packaging is confusingly similar to plaintiff's and expressing that he found the taste of MUSCLE POWER's product "horrible." (Pl.'s Not. of After-Acquired Evid., filed Apr. 30, 2009.) Moreover, plaintiff commissioned a customer survey which concluded that one in four individuals were at risk of being confused between plaintiff's and defendant's RTD

products.  (PI, ¶¶ 40-43; Declaration of Hal Poret ["Poret Decl."], filed March 13, 2009.)

Defendant contends, to the contrary, that customers of RTD nutritional products are health and fitness enthusiasts willing to pay premium amounts for a healthy drink, and thus are able to distinguish between plaintiff's and defendant's products.  (Owoc Decl., ¶¶ 29-30.)  Further, defendant asserts that due to circumstances regarding distribution of plaintiff's and defendant's RTD nutritional products, customers are unlikely to be confused between the two products.  (Id. at ¶¶ 32-37.) Defendant explains that RTD nutritional products are distributed through one of three means: (1) through direct store delivery ("DSD") to convenience stores, gas stations, grocery stores, and other mass accounts; (2) to "specialty" retailers such as gyms and health clubs that purchase through "specialty" wholesalers, and (3) directly to "specialty" vitamin chain retail health stores, such as GNC and Vitamin Shoppe, which purchase directly from the manufacturer.  (Id. at ¶ 32.)  Nearly 75% of defendant's Tetra Pak RTD nutritional product is sold through DSD distributors.  (Id. at ¶ 33.)  However, defendant alleges that plaintiff's Tetra Pak RTD nutritional product is sold predominantly to speciality wholesalers and retailers, while plaintiff's RTD nutritional product manufactured in plastic bottles is sold predominantly via DSD distribution.  (Id. at ¶ 34.)  As a result, defendant contends that confusion is unlikely to result, as its Tetra Pak product is most often offered for sale next to plaintiff's plastic bottle product. (Id. at ¶¶ 35-37.)  Plaintiff maintains, however, that its Tetra

10

Pak RTD nutritional product is frequently sold alongside
defendant's Tetra Pak product, and that 75% of its RTD
nutritional product is sold in the Tetra Pak packaging.
(Bettilyon Decl., Ex. E [Reda Dep.] at 78:22-79:4; Ex. C [White
Dep.] at 82:11-22.)

In July 2008, plaintiff learned that defendant filed a
trademark registration for the mark "Muscle Shake" for use in
connection with its nutritional supplements.  Plaintiff's counsel
subsequently sent a letter to defendant inquiring as to the
products it intended to sell under the trademark.  (PI, ¶¶ 44-
45.)  Plaintiff received no response to its letter and learned
shortly thereafter that defendant intended to launch a new
product using the MUSCLE POWER® trademark and trade dress that
was similar to that used in connection with plaintiff's RTD
nutritional product.  (Id. at ¶¶ 46-47.)  On October 16, 2008,
plaintiff's counsel sent a letter to defendant requesting that
defendant cease and desist from marketing, promoting, or selling
any and all products, including defendant's RTD nutritional
product, that infringe on plaintiff's trademarks and trade dress.
(Id. at ¶ 47.)  Defendant did not respond to this letter, and
plaintiff accordingly filed the current action for trademark and
trade dress infringement.  (Id. at ¶ 48.)  Despite defendant's
attempts to evade service of process on November 7 and 10, 2008,
plaintiff successfully served defendant with the current action
on November 12, 2008.  (Id. at ¶¶ 49-50.)

Notwithstanding the foregoing, on October 30, 2008,
defendant filed a declaratory judgment action against plaintiff
in the Southern District of Florida, and served plaintiff with

11

the complaint on November 8, 2008.  (_Id._ at ¶ 51.)  On or about

December 23, 2008, plaintiff filed a motion to dismiss the

Florida action on the basis that defendant filed its anticipatory

suit in bad faith.  (_Id._ at ¶ 52.)  The parties stipulated to

suspend the present action pending a ruling on the motion to

dismiss the Florida action.  (Order for Suspension [Docket #21],

filed Feb. 4, 2009.)  The Southern District of Florida dismissed

defendant's action on February 9, 2009.  (PI, ¶ 53.)  On April

22, 2009, the Southern District of Florida denied defendant's

motion for reconsideration of its order.  (Pl.'s Not. of Order

Denying Mot. for Reconsid. [Docket #57], filed April 23, 2009.)

**STANDARD**

The Ninth Circuit has recently clarified the controlling

standard for injunctive relief in light of the United States

Supreme Court's decision in <u>Winter v. Natural Res. Def. Council</u>,

129 S. Ct. 365 (2008).  <u>Am. Trucking Ass'ns, Inc. v. City of Los

Angeles</u>, 559 F.3d 1049 (9th Cir. 2009).  A party seeking a

preliminary injunction must demonstrate that it is likely to

succeed on the merits, that irreparable harm is likely in the

absence of preliminary relief, that the balance of equities tips

in favor of such relief, and that an injunction is in the public

interest.  _Id._ at 1052.

Previously, in trademark cases, the Ninth Circuit had held

that a plaintiff was entitled to a presumption of "irreparable

injury . . . from a showing of likelihood of success on the

merits."  <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1205

n. 4 (9th Cir. 2000).  However, the governing law has changed in

light of <u>Winter</u>.  Now, a plaintiff is not granted the presumption

12

of irreparable harm upon a showing of likelihood of success on the merits.  Am. Trucking Ass'ns, 559 F.3d at 1052-53; see also Volkswagen AG v. Verdier Microbus and Camper, Inc., 2009 WL 928130, at *6 (N.D. Cal. Apr. 3, 2009).  Indeed, in Winter, the Court emphasized that to be entitled to preliminary injunctive relief, a plaintiff must demonstrate that irreparable injury is "*likely* in the absence of an injunction."  129 S. Ct. at 375-76 (emphasis in original) (recognizing that issuing a preliminary injunction based only a "possibility" of irreparable harm is "inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").  Ultimately, because a preliminary injunction is an extraordinary remedy, in each case, the court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Id. at 376.

**ANALYSIS**

**I.   Likelihood of Success on the Merits**

   **A.   Trademark Infringement**

      Plaintiff moves for a preliminary injunction, arguing it is likely to succeed on the merits of its trademark and trade dress infringement claims under the Lanham Act.  15 U.S.C. §§ 1114, 1116, 1125(a).  The court considers these issues separately below.  First, to prevail on a trademark infringement claim under the Lanham Act, a plaintiff must establish that the defendant is "using a mark confusingly similar to a valid, protectable trademark" of the plaintiff's.  Brookfield Communications, Inc.

13

v. West Coast Entertainment, 174 F.3d 1036, 1046 (9th Cir. 1999).
Or, as the court in Brookfield clarified: "[m]ore precisely,
because we are at the preliminary injunction stage, [the
plaintiff] must establish that it is likely to be able to show .
. . a likelihood of confusion." Id. at 1052 n. 15. As to the
threshold component, here, plaintiff submits registration
certificates for its MUSCLE MILK® trademark. These registrations
constitute *prima facie* evidence that plaintiff owns a valid and
protectable mark and has the exclusive right to use the
registered mark in commerce on or in connection with the goods or
services specified in the registrations. 15 U.S.C. § 1115(a);
Applied Info. Sciences Corp. v. eBay, Inc., 511 F.3d 966, 970
(9th Cir. 2007).

While maintenance of a valid and protectable mark is a
prerequisite to bringing a trademark claim, the likelihood of
confusion is the central element of a trademark infringement
action. "The [core] issue can be recast as the determination of
whether 'the similarity of the marks is likely to confuse
customers about the source of the products.'" GoTo.com, 202 F.3d
at 1205.[1] The Ninth Circuit has developed eight factors (the
so-called Sleekcraft factors) to guide the determination of
likelihood of confusion: (1) the similarity of the marks; (2) the
relatedness of the two companies' products; (3) the marketing
channels used; (4) the strength of the plaintiff's mark; (5) the

_____

[1]     Likelihood of confusion is also the test for trademark
infringement and unfair competition under California common and
statutory law. See Century 21 Real Estate Corp. v. Sandlin, 846
F.2d 1175, 1180 (9th Cir. 1988). Therefore, the inquiry is the
same for plaintiff's federal trademark infringement claim and its
state law trademark infringement and unfair competition claims.

14

defendant's intent in selecting its mark; (6) evidence of actual
confusion; (7) the likelihood of expansion into other markets;
and (8) the degree of care likely to be exercised by the
purchasers.  AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49
(9th Cir. 1979).  This eight-factor test is "pliant," with some
factors being more important than others, and the relative
importance of each factor being case-specific.  Brookfield, 174
F.3d at 1054.

### 1.  Similarity of the Marks

This factor has always been considered a critical question
in the likelihood of confusion analysis.  This factor, along with
the second and third factors (relatedness of the products and the
use of a common marketing channel), constitutes part of the
"controlling troika in the Sleekcraft analysis."  GoTo.com, 202
F.3d at 1205.  The marks must be considered in their entirety and
as they appear in the marketplace.  Id. at 1206.  Similarity is
adjudged in terms of appearance, sound, and meaning, and
similarities are weighed more heavily than differences.  Id.

A review of the labels of both plaintiff's and defendant's
products shows that this factor weighs heavily in plaintiff's
favor.  First, however, with respect to the trademarks
themselves, both marks comprise a two-word composite trademark
beginning with the word MUSCLE wherein the composite trademark
conveys a similar commercial connotation to consumers.  It is
well established that the use of two trademarks comprising
different terms but which convey an overall similar commercial
connotation may tend to confuse consumers.  See e.g., Standard
Oil Co. v. Standard Oil Co., 252 F.2d 65, 73-74 (10th Cir. 1958)

(recognizing that "[t]he use of a designation which causes confusion because it conveys the same idea, or stimulates the same mental reaction, or has the same meaning is enjoined on the same basis as where the similarity goes to the eye or the ear").[2] Here, both marks convey impressions of strength and nutrition to the consumer.

Contrary to defendant's suggestion, it is not pertinent to the inquiry that plaintiff had to disclaim the term "muscle" for one of its trademark applications for the MUSCLE MILK® mark (U.S. Registration No. 2,809,666). "[I]n determining whether infringement of a trademark has occurred, disclaimed material forming part of a registered trademark cannot be ignored. It is still part of the composite trademark which must be considered in its entirety." Kelly Blue Book v. Car-Smarts, Inc., 802 F. Supp. 278, 291 (C.D. Cal. 1992) (internal quotations omitted). "Such disclaimers are not helpful in preventing likelihood of confusion in the mind of the consumer, because [the consumer] is unaware of their existence." Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570 (Fed. Cir. 1983). Moreover, the specific registration that pertains to the MUSCLE MILK® RTD product at issue does not have a disclaimer, and thus, defendant's argument is irrelevant to the matter. (White Decl.,

---

[2] See also Synergistic Intern., LLC. v. Korman, 470 F.3d 162 (4th Cir. 2006) (affirming summary judgment of infringement between GLASS DOCTOR and WINDSHIELD DOCTOR for windshield repair); National Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co., 362 F.2d 374 (5th Cir. 1966) (upholding infringement between BLUE SHIELD and RED SHIELD for health insurance); Kraft-Phenix Cheese Corp. v. R.E. Robertson, Inc., 9 F. Supp. 125 (D. Mich. 1934) (finding infringement between MIRACLE WHIP and WONDER MIX for salad dressing).

Ex. C [U.S. Registration 2,973,352 which covers "pre-mixed nutritionally fortified beverages"].)

In addition to the marks' similar commercial connotations, the similarities between the marks as they appear in the marketplace, namely, through employment of their respective product dresses, are extremely telling. The similarities between marks must be examined as they are encountered in the marketplace. <u>AMF, Inc.</u>, 599 F.2d at 351. That is, "[t]he comparison should be made in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of goods." <u>Walt Disney Productions v. Air Pirates</u>, 581 F.2d 751, 759 (9th Cir. 1978). In this case, the similarities between the marks are significantly accentuated by VPX's near identical incorporation of CS's trade dress into its own product. Indeed, "with a single glance at the two images, one is immediately struck by their similarity." <u>GoTo.com</u>, 202 F.3d at 1206.

The features of CS's trade dress which have been employed by VPX include the following: (1) the package front of the MUSCLE POWER product is visually divided into three sections, top, middle, and bottom; (2) on the middle portion of the package, the word MUSCLE is prominently displayed above the second word of the composite mark in all capital letters in a bold, block-letter, white-colored font on a dark background; (3) on the lower portion of the package a depiction of a swirled colored liquid appears reflecting the color of the product in the package, *i.e.*, brown for chocolate, red for strawberries and cream, etc.; (4) on the top portion of the package, an identification of the flavor in

17

words and a picture appears; (5) on the side of the package, the
MUSCLE POWER mark is printed in bold, block-letter font and
oriented so the consumer can read the words from the bottom to
the top of the package; and (6) VPX uses the Tetra-Pak packages
which are created by printing a label directly on to a flat piece
of packaging material that is subsequently folded into a
three-dimensional carton that can be filled with the product.
(White Decl., ¶¶ 29, 39.)

Defendant's efforts to expose trivial distinctions between
the two marks are unimpressive. VPX points to only subtle
differences between the way the marks are used, such as the red
outline around its brand name, as opposed to plaintiff's black
outline, and the "splash" on the bottom of its package instead of
plaintiff's "swirl." These minor differences are "trivial
distinctions" especially when viewing the products in full, as
they appear in the marketplace. <u>Abercrombie v. Fitch Co. v.
Moose Creek, Inc.</u>, 486 F.3d 629, 636 (9th Cir. 2007). Seen in
that light, the marks are glaringly similar. <u>Phat Fashions, LLC
v. Phat Game Athletic Apparel, Inc.</u>, 2002 WL 570681, at *8 (E.D.
Cal. March 20, 2002) ("Put plainly, the combination of features
as a whole rather than a difference in some details must
determine whether the competing product is likely to cause
confusion in the minds of the public.")

Additionally, VPX's use of its logo in conjunction with its
MUSCLE POWER mark is inconsequential. VPX's logo is
comparatively small and only noticeable upon close inspection.
The clear emphasis on the packaging is on the MUSCLE POWER® mark.
In this respect, this case is akin to <u>Sleekcraft</u>. There, the

18

court noted that while the defendant used a house mark in connection with the infringing product, its use was in a smaller, skewed lettering leaving the emphasis on the primary mark. AMF, Inc., 599 F.2d at 351. Like in Sleekcraft, defendant's use of its VPX logo is not sufficiently prominent or distinctive to mitigate any likelihood of confusion between MUSCLE POWER® and MUSCLE MILK®.

Moreover, the fact that the PTO did not find the two marks confusingly similar is not dispositive. The PTO makes its determination based upon the mark as it is presented for registration, regardless of how the mark may be used in the marketplace. See Amsted Industries, Inc. v. West Coast Wire Rope & Rigging Inc., 2 U.S.P.Q.2d 1755, 1758-59 (T.T.A.B. 1992); Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 801-02 (9th Cir. 1970) (recognizing that the finding by the trademark examining attorney "must be regarded as inconclusive since [it is] made at [the] lowest administrative level" and that the ultimate determination by the PTO "is rendered less persuasive still by the fact that the [PTO] did not have before it the great mass of evidence which the parties [subsequently present]"). Here, the PTO was unaware that the MUSCLE POWER product is virtually identical to MUSCLE MILK, sold through identical channels of trade, to an identical class of consumer, in identical packaging and with virtually identical labeling schemes.

An example similar to this case may be found in Classic Foods International Corp. v. Kettle Foods, Inc. Finding striking similarity between the marks KETTLE CLASSICS and KETTLE CHIPS,

19

the court in <u>Classic Foods</u> noted that the first word of the mark appeared directly above the second word, both words were centered on the packaging, both marks were written in thick block capital letters, and in the same style and font. <u>Classic Foods International Corp., v. Kettle Foods, Inc.</u>, 2006 WL 5187497, at *10 (C.D. Cal. Mar. 2, 2006) (noting that "[e]ven the most cursory glance at the two products' packaging reveals a striking similarity"); <u>see also</u> <u>Abercrombie</u>, 486 F.3d at 636 (noting that the differences in the marks there were a "trivial distinction with no effect on our observation that with a single glance at the two images, one is immediately struck by their similarity"). Much like the <u>Classic Foods</u> case, the similarity between the MUSCLE MILK® and MUSCLE POWER® marks is significantly enhanced by consideration of the trade dress employed by VPX for its products. As noted above, VPX has chosen an identical font, in an identical color, on an identically shaped package, and placed the mark on the package in an identical location. (White Decl., ¶ 38, 39.) While one must acknowledge that there are some dissimilarities between the MUSCLE POWER® and MUSCLE MILK® marks, like in <u>Abercrombie</u>, with even a cursory glance at the two products as they appear in the marketplace, "one is immediately struck by their similarity." <u>Abercrombie</u>, 486 F.3d at 636. When the marks are viewed as a whole with each product's respective trade dress, the court has no difficulty concluding that the two marks are overwhelming similar.

## 2. Relatedness of the Products

The products offered by VPX using its MUSCLE POWER® mark and trade dress, and the goods offered by plaintiff using the MUSCLE

MILK® mark and trade dress are substitute products; in the eyes of the consumer, one product could be substituted for the other. VPX does not dispute this fact.

It is well established that the greater the similarity between the products or services, the greater the likelihood of confusion. The court in <u>Sleekcraft</u> succinctly explained this doctrine:

> For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists. The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion. Thus, less similarity between marks will suffice when the goods are complementary, the products are sold to the same class of purchasers, or the goods are similar in use and function.

<u>AMF, Inc.</u>, 599 F.2d at 350 (internal quotations and citations omitted). In the present case, the similarities between the products are clear. Both products promote themselves as high protein supplements and come in a ready-to-drink form. Further, both products claim to be lactose free and claim to increase lean muscle. (White Decl., ¶¶ 30, 34, 35.) In fact, VPX's own promotional materials promote the MUSCLE POWER product as having more protein than MUSCLE MILK. (<u>Id.</u> at ¶ 31.) The products are in direct competition with one another and compete for the same purchaser. (<u>Id.</u> at ¶ 32.) Based on the substitute nature of the products, this factor strongly favors a finding of likelihood of confusion.

### 3. Marketing Channels Used

The Ninth Circuit has repeatedly recognized that "[c]onvergent marketing channels increase the likelihood of

confusion." <u>AMF, Inc.</u>, 599 F.2d at 353. Here, both CS and VPX sell their products through nearly identical retail outlets, using substantially the same methods, and compete for exactly the same customers. More specifically, CS markets its products to consumers through a network of retail outlets comprising specialty health and nutrition stores, grocery chains, convenience stores, and warehouse outlet stores. (White Decl., ¶ 9.) VPX sells their products through many of the same retail outlets. (<u>Id.</u> at ¶ 41.) VPX contends, however, that fact is not determinative of the likelihood of confusion between the products; according to VPX, the realities of the marketplace are such that due to certain, specific distribution channels employed by CS and VPX, VPX's MUSCLE POWER, in the Tetra Pak packaging, is most often offered for sale next to or near CS's MUSCLE MILK plastic bottles, thus decreasing any chance of a likelihood of confusion. (Owoc Decl., ¶ 37.)

Plaintiff offers compelling evidence to the contrary. While plaintiff's MUSCLE MILK® RTD product in plastic containers has become more widely distributed since February 2008, when plaintiff entered a new distribution agreement with Pepsi Bottlers, the vast majority of MUSCLE MILK® RTD products continue to be distributed in a Tetra Pak. CS estimates that approximately 75% of its MUSCLE MILK RTD products are sold in Tetra Paks. (Bettilyon Decl., Ex. C [White Dep.] at 82:11-22.) Moreover, plaintiff provides evidence of multiple instances where MUSCLE POWER® and MUSCLE MILK® are sold side-by-side in the Tetra Pak. (<u>Id.</u> at Ex. E [Reda Dep.] at 78:22-79:16.) Indeed, in discovery in this case, VPX produced a picture showing Tetra Paks

22

of MUSCLE MILK® and MUSCLE POWER® being sold in the same refrigerated cooler. (Id. at Ex. F)

In addition to using similar retail outlets, CS and VPX employ similar methods of advertising for their products. CS advertises and promotes its products through printed publications, paid professional endorsements, trade shows, billboards, athletic events, and over the Internet. (White Decl., ¶¶ 24, 25, 41.) While VPX may not employ all of CS's advertising methods, VPX does advertize in print publications, trade shows, and over the Internet.

Finally, VPX markets and sells its products to those same consumers targeted by CS's marketing efforts, i.e., persons interested in bodybuilding and overall health and nutrition. (Owoc Decl., ¶¶ 29-30.)

In sum, because CS and VPX sell their products through nearly identical retail outlets, using largely identical methods, and compete for exactly the same customers, this factor also strongly favors a finding of likelihood of confusion.

### 4. Strength of Plaintiff's Mark

The more likely a mark is to be remembered and associated in the public's mind with the mark's owner, the greater protection the mark is accorded by trademark laws. GoTo.com, 202 F.3d at 1207. The "strength" of the trademark is evaluated in terms of its conceptual strength and commercial strength. Id. More specifically, "[t]he strength of a mark is determined by its placement on a continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful awarded maximum protection."

<u>E. & J. Gallo Winery v. Gallo Cattle</u>, 967 F.2d 1280, 1291 (9th
Cir. 1992).  While defendant argues that, at most, plaintiff's
MUSCLE MILK® trademark is a descriptive mark entitled to minimal
protection, the court is satisfied that plaintiff has produced
sufficient evidence to demonstrate a likelihood of success in
showing that the mark is, at least, a suggestive mark.

Suggestive terms suggest characteristics of the underlying
goods and require an effort of the imagination by the consumer to
ascertain the type of product.  The "imagination test" focuses on
the amount of imagination required for a consumer to associate a
given mark with the goods or services it identifies.  If a
consumer must use more than a small amount of imagination to make
the association, the mark is suggestive and not descriptive.
<u>Rodeo Collection, Ltd. v. West Seventh</u>, 812 F.2d 1215, 1218 (9th
Cir. 1987).  Here, the composite term MUSCLE MILK® does not
describe a quality or characteristic of the underlying
nutritional supplement.  In fact, the product is not "milk" as
that term is used in the dairy industry (the product is lactose-
free), and the term "muscle" is used frequently by many different
entities in a variety of ways such that a consumer would not
automatically jump to the conclusion that the product is a
nutritional product.  <u>See e.g.</u>, <u>Dreamwerks Production Group, Inc.
v. SKG Studio</u>, 142 F.3d 1127, 1130-31 (9th Cir. 1998) (noting
term "dream is used in too many different ways to suggest any
particular meaning to the reasonable consumer.").  As such, the
MUSCLE MILK® mark, at a minimum, requires significant imagination
on the part of the consumer to guess the underlying goods and

services associated with the mark.[3]

Once a determination regarding the position of a mark and dress on the relevant spectrum of trademarks and trade dress has been made, the court must then consider the marketplace strength of the mark and dress. GoTo.com, 202 F.3d at 1207. The more extensively advertised and readily identifiable a mark and dress are in the relevant market, the stronger the mark and dress. Brookfield, 174 F.3d at 1058; see also Golden Door, Inc. v. Odisho, 646 F.2d 347, 350-51 (9th Cir. 1980) (evidence of extensive media coverage supported determination that mark had acquired national recognition); M2 Software, Inc. v. Madacy Entertainment, 421 F.3d 1073, 1081 (9th Cir. 2005) (noting strength of relatively non-distinct mark is bolstered by evidence of commercial success).

Here, CS proffers evidence that its MUSCLE MILK® trademark and trade dress have been used extensively in connection with advertising its MUSCLE MILK® RTD protein products in publications across the United States, on the Internet, in magazines, and other trade publications. (White Decl., ¶ 24.) CS has spent tens of millions of dollars advertising its MUSCLE MILK® RTD products and has spent hundreds of millions of dollars

---

[3] The court separately discusses below plaintiff's claim of trade dress infringement. The majority of this discussion of likelihood of confusion equally pertains to that claim. GoTo.com, 202 F.3d at 1205 (noting that analyses between trademark and trade dress infringement are "practically identical"). However, certain specific findings are necessary under some of the Sleekcraft factors. On the issue of strength of plaintiff's trade dress, because there is no natural connection between the features of CS's trade dress and a protein supplement, CS's trade dress when used in connection with a protein supplement is arbitrary, and therefore, is conceptually strong.

advertising the MUSCLE MILK® brand and its associated trade dress generally. (Id. at ¶ 23.) CS specifically promotes its MUSCLE MILK® RTD products through magazine ads, promotions at athletic events, celebrity endorsements, trade shows, Internet videos, and other media outlets. (Id. at ¶ 24.) Moreover, since at least as early as 1998, CS has consistently used similar trade dress features on all of its products bearing the MUSCLE MILK® mark. (Id. at ¶ 14.) These facts serve to strengthen the MUSCLE MILK® mark and related trade dress.

Finally, "[t]he less that third parties use the mark, the stronger it is, and the more protection it deserves." Corp. v. Texas Motor Exchange of Houston, Inc., 628 F.2d 500, 504 (5th Cir. 1980) ("A strong trademark is one that is rarely used by the parties other than the owner of the trademark.") CS submits evidence to show that no party has adopted the term MUSCLE MILK for use in connection with any products or services, much less for use in connection with a RTD protein beverage. (White Decl., ¶ 26.) Moreover, plaintiff provides evidence that no companies have previously used CS's trade dress or something significantly similar in conjunction with a RTD protein drink. That is, no one has adopted the entire selling image CS employs with its MUSCLE MILK® products. (See Bettilyon Decl., Ex. Q.)

Defendant's rebuttal evidence is not compelling. VPX argues that the marketplace is crowded with products employing the term "muscle." However, of the sixty-six trademark registrations cited by VPX in the nutritional supplement category that incorporate the term "muscle," only seven registrations (excluding those at issue in this case) include a claim for any

26

type of beverage in the registration.  Further, in spite of what these seven registrations claim to cover, defendant offers no evidence that any of these seven companies sell protein drinks. Additionally, of the eleven companies cited by defendant which use "muscle" in their company name, defendant has not shown that any of these companies sell competing products to plaintiff's.[4] Thus, plaintiff's evidence showing the lack of third parties' use of similar marks on similar products serves to strengthen the MUSCLE MILK® mark and associated trade dress.

Based on the above, the court finds that plaintiff has shown a likelihood of success in demonstrating that MUSCLE MILK® is a strong mark and uses a strong trade dress which should be afforded broad protection.  As such, this factor heavily favors a finding of likelihood of confusion.

### 5. Defendant's Intent in Selecting its Mark

An intent to copy is strong evidence of likelihood of confusion.  <u>AMF, Inc.</u>, 599 F.2d at 354.  In <u>Sleekcraft</u>, the Ninth Circuit noted that "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived."  <u>Id.</u>  While such evidence is not required, "when the evidences does show *or require the inference* that another's name was adopted deliberately with a view to obtain

---

[4]    Contrary to <u>Matrix Motor Co., Inc. v. Toyota Motor Corp.</u>, 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003) (finding that an arbitrary mark could be classified as weak in the face of extensive third-party use of similar marks on similar goods) relied upon by defendant, here, there has been no such showing of extensive third-party use.  Defendant's evidence demonstrates at best, broad references to uses of the term "muscle" in connection with other marks on other non-competing goods.

some advantage from the goodwill, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit." Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 158 (9th Cir. 1963) (emphasis added).

Here, plaintiff submits evidence that VPX specifically targeted plaintiff and its MUSCLE MILK® product when it created and introduced into the market its MUSCLE POWER® brand. (Bettilyon Decl., Ex. A [Beverage Spectrum March 2009 article describing VPX President John Owoc's statements about plaintiff and its MUSCLE MILK product].) In introducing its product, VPX was certainly aware of plaintiff's MUSCLE MILK® product.

Additionally, evidence of VPX's intent to derive benefit from CS's valuable MUSCLE MILK® brand may be found in the obvious similarity between the product packaging and labeling. See e.g., K-Swiss, Inc. v. USA ASIQI Shoes, Inc., 291 F. Supp. 2d 1116, 1124 (C.D. Cal. 2003) (drawing inference of intent to deceive based on factors including senior marks' strong reputation and overall appearance of products); NEXxUS Products Co. v. Gentle Concepts, Inc., 1993 WL 496824, at *7 (M.D. Fla. April 30, 1993) (finding similarity between products noting that "[s]uch similarity could not have been accomplished . . . without a deliberate intent to copy."). The many similarities between plaintiff's trade dress and the dress used by VPX in connection with its MUSCLE POWER product are discussed at length above. In short, some of the more salient similarities can be summarized as follows: Out of the many possible options available, VPX chose

28

to market its product in packages that are identically shaped to one of CS's MUSCLE MILK® RTD products and adopted a remarkably similar trade dress (i.e., position of the marks on the packaging, identical font, identical style, identical color, etc.). (White Decl., ¶¶ 22, 39.) Plaintiff proffers evidence of the many packaging shapes available to VPX for use in connection with its RTD protein products, yet VPX chose the identical Tetra Pak packaging used by plaintiff. (Id. at ¶ 27, Ex. H.) VPX made this choice despite the fact that Tetra Pak offers at least three different package containers suitable for aseptic packaging in the same 17 fluid ounce size selected by MUSCLE POWER. (Bettilyon Decl., Exs. G, H and I.) While some of these packaging types may not be as desirable to VPX,[5] VPX had legal obligation to distinguish its MUSCLE POWER product from plaintiff's. While VPX was free to choose the exact Tetra Pak packaging that plaintiff's uses, once it did so, VPX had an even stronger obligation to distinguish its product, which has a similar trademark, with a trade dress that separated its product from plaintiff's MUSCLE MILK® product.

In addition to the packaging shapes, plaintiff proffers evidence of the numerous ways of labeling those different packaging alternatives. (White Decl., ¶ 28, Ex. I.) Indeed, contrary to defendant's argument that "the Tetra Pak package does not leave many creative options as to the placement of graphics, products, company logo, etc.," the Tetra Pak website notes "there

---

[5]     In its sur-reply, defendant indicates that while plaintiff and other competitors use some of the other packaging referenced by plaintiff, VPX "dislikes" it and thus chose not to use it. (Docket #68 at Ex. C.)

are more than a thousand ways to configure a Tetra Brik package [the specific Tetra Pak package used here]." (Bettilyon Decl., Ex. P.) Other companies utilizing Tetra Pak's technology prove that point; a wide variety of companies using Tetra Pak use an array of trade dress that is not remotely similar to CS's trade dress. (Id. at Ex. H and I.) Moreover, contrary to defendant's claims, none of the major competitors selling RTD protein drinks use trade dress similar to that of MUSCLE MILK. (Id. at Ex. Q.) MUSCLE POWER is the only product to employ virtually every aspect of MUSCLE MILK's unique trade dress. Id. Such copying is strong evidence of a desire to confuse the marketplace and trade on CS's goodwill and brand name.

Additionally, in choosing a trade dress for its MUSCLE POWER product, VPX made a marked departure from its trade dress on similar products. (Id. at Ex. T.) The hallmark of VPX's marketing appears to be vertical lettering against a solid background which is often, but not always, blue. In stark contrast to the MUSCLE POWER trade dress, these other VPX products do not divide the package into three portions, do not use horizontal lettering, do not use a "splash" at the bottom to depict the flavor, and otherwise look very different from the trade dress selected for MUSCLE POWER. If defendant truly sought to distinguish itself from MUSCLE MILK and not trade on MUSCLE MILK's goodwill and reputation, VPX could have easily used a trade dress more consistent with its other RTD products, *e.g.*, Redline, Black Pearl and Pump 7. The marked departure from these other trade dress styles, coupled with the near exact copy of MUSCLE MILK's trade dress, is strong evidence of an intent to

30

deceive.  This factor weighs in favor of plaintiff and a finding
of likelihood of confusion.

### 6.    Evidence of Actual Confusion

Evidence that the use of the two marks has already led to
confusion is "persuasive proof that future confusion is likely."
AMF, Inc., 599 F.2d at 352.  Here, the similarity between the
MUSCLE MILK® mark and trade dress and the MUSCLE POWER® mark and
trade dress, and the resulting likelihood of confusion, is
buttressed by strong evidence of actual confusion.

Courts in the Ninth Circuit often rely on at least three
types of evidence to show actual consumer confusion: "(1)
evidence of actual instances of confusion; (2) survey evidence;
and (3) inferences arising from judicial comparison of the
conflicting marks and the context of their use in the
marketplace."  Classic Foods, 2006 WL 5187497 at *14.  In this
case, CS has significant evidence in each of these categories.

First, CS has proffered evidence of actual confusion in the
marketplace.  For example, one customer contacted plaintiff to
complain that he did not like the new formula for plaintiff's RTD
product; however, the customer had actually purchased defendant's
RTD product and mistaken it for plaintiff's product.  (PI, ¶ 36;
Maun Decl., ¶¶ 3-6.)  Plaintiff also submits a declaration from
Jerry Reda, an experienced beverage distributor, who believed
that defendant's RTD product was manufactured by plaintiff.  (PI,
¶¶ 37-39; Reda Decl., ¶ 6.)  Additionally, plaintiff proffers
evidence that during a recent beverage trade show, several owners
of 7-Eleven stores expressed confusion regarding the source or
origin of the MUSCLE POWER product.  (Bettilyon Decl., Ex. C

31

[White Dep.] at 28:19-25.)  Plaintiff also submits evidence that
one of its employees encountered a customer in a 7-Eleven store
who confused defendant's MUSCLE POWER® product with that of
plaintiff's.  (Bettilyon Decl., Ex. D [Blair Decl.] at ¶¶ 4-19.)
Finally, plaintiff submits an email it received from a customer,
complaining that defendant's packaging is confusingly similar to
plaintiff's and expressing that he found the taste of MUSCLE
POWER's product "horrible."  (Pl.'s Not. of After-Acquired Evid.,
filed Apr. 30, 2009.)

   Defendant objects to the above evidence on hearsay grounds,[6]
arguing plaintiff's employees cannot proffer this evidence of
customer confusion.  (See Def.'s Objs. to Evid., filed April 17,
2009.)  Defendant's objection is unavailing.  The Ninth Circuit
has not specifically addressed the issue, and the circuit courts
are split with respect to whether employee testimony regarding
consumer confusion is hearsay.  However, the majority opinion is
that such testimony is not hearsay.  "Although at least one
circuit court has held that such evidence is inadmissible
hearsay, the majority of circuit courts that have considered this
issue have . . . found that such evidence is admissible."
Conversive, Inc. v. Conversagent, Inc., 433 F. Supp. 2d 1079,
1091 (C.D. Cal. 2006).  Specifically, only the Eighth Circuit has
held such testimony to be inadmissible.  Duluth News-Tribune v.
Mesabi Pub. Co., 84 F.3d 1093, 1098 (8th Cir. 1996).  In

   [6]   Clearly, defendant's hearsay objection is not properly
asserted against the testimony of distributor Jerry Reda or the
consumer, Adam McGee, who emailed plaintiff, as they provide
direct testimony based on their own personal experiences and
observations.

contrast, the Second, Third, Fourth, and Fifth Circuits have all held that such evidence is admissible. <u>Fun-Damental Too, Ltd. v. Germany Indus. Corp.</u>, 111 F.3d 993, 1003-04 (2d Cir. 1997) (statements regarding consumer confusion were not offered to show the truth of the matter asserted and were offered to show the state of mind of the declarant consumers); <u>Armco Co., Inc. v. Armco Burglar Alarm Co., Inc.</u>, 693 F.2d 1155, 1160 n.10 (5th Cir. 1982) (same); <u>Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City</u>, 383 F.3d 110, 133 (3d Cir. 2004) (same); <u>Lyons Partnership, L.P. v. Morris Costumes, Inc.</u>, 243 F.3d 789, 804 (4th Cir. 2001) (same).

Typically, courts agreeing with the majority opinion conclude that employee testimony regarding consumer confusion is not being offered for the truth of the matter asserted by the confused consumer (the out-of-court declarant), but rather for the fact that the confusing statement was observed by the employee. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of the matter asserted, and the statement is not hearsay." <u>Mustang Motels, Inc. v. Patel</u>, 1985 WL 72659 (C.D. Cal. Mar. 1, 1985). Additionally and/or alternatively, some courts hold that an employee's testimony of confused consumers is evidence of the consumers' then-existing state of mind (confusion), which also is not hearsay. <u>See e.g.</u>, <u>Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.</u>, 111 F.3d at 993 (hearsay admissible under Fed. R. Evid.

803(3)).[7]

Similarly here, the consumer and dealer statements, described, for example, in the declarations of Chris Maun, Chad Blair and John Blair, are not being offered for the truth of the matter asserted by the consumers, but rather for the truth regarding these witnesses' perception of the consumers' confused state of mind. For example, Mr. Maun's testimony is not being offered as proof that the consumer "did not like Muscle Milk's 'new formula,'" but rather as evidence of Mr. Maun's objective assessment of the customer's confusion--the customer's then-existing state of mind. Accordingly, the proffered testimony is not offered for the truth of the matter asserted and is offered as evidence of a then-existing state of mind and, therefore, is not hearsay.[8]

In addition to the declarations and deposition testimony cited above, CS submits a consumer survey which it commissioned with respect to the likelihood of confusion between the MUSCLE POWER® and MUSCLE MILK® marks. The consumer survey comprised a mall intercept survey of 419 respondents at 12 mall research

---

[7]     Defendant contends nonetheless that while these courts have overruled hearsay objections to similar evidence, they have required that the evidence be corroborated in writing, specific and that there are other indicators of reliability. The court does not agree that these cases, as a whole, have required this further showing; however, even if such a showing were required, the court finds plaintiff's evidence, described above, sufficiently documented, specific and reliable.

[8]     Moreover, the court notes that even if CS's declarations included inadmissible hearsay, it is well established that "[i]t is within the discretion of the district court to accept . . . hearsay for purposes of deciding whether to issue [a] preliminary injunction." Republic of the Philippines v. Marcos, 862 F.2d 1355 (9th Cir. 1988).

facilities across the country.  208 respondents were assigned at random to a Test Group, and the other 211 respondents were assigned to a Control Group.  According to the consumer survey, approximately 51.9% of those surveyed answered that the MUSCLE POWER® product was made by the same company that makes MUSCLE MILK® or is connected or affiliated with the same company. Within the Control Group, 26.5% of those surveyed responded that the control product was made by the same company that makes MUSCLE MILK® or is connected or affiliated with MUSCLE MILK. Subtracting the Control Group from the Test Group resulted in a net confusion level of 25.4% between the MUSCLE POWER product and the MUSCLE MILK® product.  (Poret Decl., ¶ 5-8.)

Defendant vigorously contests the merits of this study, both the procedures employed and the results reached,[9] and has offered rebuttal expert testimony, which plaintiff has responded to extensively in its reply.[10]  However, for purposes of this motion, the court need not resolve the parties' disputes on this issue.  To obtain a preliminary injunction, plaintiff need only demonstrate a likelihood of success in showing consumer

---

[9]    Defendant contends CS's survey should not be given any weight for the following reasons: (1) the proper universe of consumers was not polled, (2) without the proper universe there cannot be a proper representative sample, (3) the survey is flawed insofar as the stimuli used was improper, (4) the survey is flawed insofar as the research design does not consider the realities of the marketplace, and (5) there were execution errors in the survey.

[10]    Notably, while defendant submits a declaration by an expert who criticizes plaintiff's survey, defendant did not conduct its own survey, despite adequate time to do so.  At oral argument, remarkably, defendant's counsel admitted that he and his client made a conscious choice to not perform a competing survey as *they* believed the motion was baseless and a survey was thus, unnecessary.

confusion, considering *all* the <u>Sleekcraft</u> factors. <u>GoTo.com</u>, 202

F.3d at 1208 (declining to evaluate dueling customer confusion

surveys because even if the plaintiff's study was "pure fantasy

and . . . no one was actually confused, it would . . . [not]

refute a [finding of] likelihood of confusion" considering, on

balance, all the <u>Sleekcraft</u> factors).  It is sufficient for a

preliminary injunction motion that plaintiff has proffered survey

evidence as *some* evidence of actual confusion.  In fact, this

court as well as other circuit courts have accepted survey

results well below the 25% net confusion, reported by plaintiff

here, to support a finding of likelihood of confusion.  <u>See</u> <u>CSC</u>

<u>Brands LP v. Herdez Corp</u>, 191 F. Supp. 2d 1145, 1151-52 (E.D.

Cal. 2001) (survey showing 15% of respondents were confused about

products at issue); <u>Exxon Corp. v. Texas Motor Exchange of</u>

<u>Houston, Inc.</u>, 628 F.2d 500, 507 (5th Cir. 1980) (15% found

confusion regarding the two marks at issue and 23% found

confusion regarding the two products at issue); <u>RJR Foods, Inc.</u>

<u>v. White Rock Corp.</u>, 603 F.2d 1058, 1059 (2nd Cir. 1979) (survey

showing 15-20% confusion rate accepted as part of evidence of

likelihood of confusion); <u>James Burrough, Ltd. v. Sign of</u>

<u>Beefeater, Inc.</u>, 540 F.2d 266, 277-78 (7th Cir. 1976) (15%

confusion rate found to be dispositive of likelihood of

confusion).

Finally, for the reasons set forth above, due to the glaring

similarity between plaintiff's and defendant's marks and trade

dresses, the court can also properly infer likely instances of

actual customer confusion.  <u>See</u> <u>Classic Foods</u>, 2006 WL 5187497 at

*14 (recognizing that actual confusion may be found on the basis

of "inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace").

Based on all of the above evidence of actual confusion, this factor clearly weighs in favor of a finding of likelihood of confusion and strongly supports CS's probable success on the merits of its infringement claims.

### 7. Likelihood of Expansion into Other Markets

"A strong likelihood that either party may expand his business to compete with the other favors a finding of infringement." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993). However, when parties "already sell directly competing products," this factor does not weigh in either party's favor. Sutter Home Winery, Inc. v. Madrona Vineyards, LP, 2005 WL 701599, at *13 (N.D. Cal. March 23, 2005). In this instance, the products offered under the respective marks are identical, substitute products. As such, this factor does not favor either party.

### 8. Degree of Care Likely to be Exercised by the Purchasers

Where products are relatively inexpensive, there is a higher likelihood that consumers will be confused because they are likely to use less care while shopping. Classic Foods, 2006 WL 5187497 at *14. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous." AMF, Inc., 599 F.2d at 353 (internal citations

omitted).

In this case, the RTD protein products at issue are inexpensive items in which consumers are less likely to use particular care in selecting a specific protein drink. As such, there is a higher risk of consumer confusion. A single-serve RTD MUSCLE MILK® product retails on average between $3.00 and $5.00. (White Decl. ¶¶ 17, 20.) The MUSCLE POWER product retails for a similar price. (Id. at ¶ 33.) In other cases, courts have found that consumer products in similar, or even slightly greater, price ranges are inexpensive items that do not cause consumers to exercise a great degree of care. See Classic Foods International Corp., 2006 WL 5187497 at *14 (degree of care weighed in favor of likelihood of confusion where large bag of chips ranged from $3.50 to $7.00); CSC Brands LP, 191 F. Supp. 2d at 1152 ("Given that these beverages are sold in supermarkets and are low cost, the degree of care likely to be exercised by purchasers is minimal."); K-Swiss, Inc., 291 F. Supp. 2d at 1125 (reasonable consumer unlikely to exercise high degree of care in selecting tennis shoes).[11] As such, this final factor also favors a finding of likelihood of confusion.

---

[11] Defendant's argument to the contrary is unavailing. Even assuming defendant is correct that the consumers of its products are particularly sophisticated consumers who are very health conscious and careful about what they consume, the products themselves still remain comparatively inexpensive as consumer purchases. This fact is reflected in the above cases. Indeed, even the case relied upon by defendant, Adidas-America, Inc. v. Playless Shoesource, Inc., 546 F. Supp. 2d 1029, 1059 (D. Or. 2008), recognized that courts have found that "purchasers of relatively inexpensive athletic and sportswear are not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the goods."

In sum, the court finds that, on balance, application of the *Sleekcraft* factors demonstrates that plaintiff is likely to be able to show that VPX is using a confusingly similar mark. Accordingly, plaintiff has demonstrated a likelihood of success on the merits of its trademark infringement claim.

## B. **Trade Dress Infringement**

"A seller's adoption of a trade dress confusingly similar to a competitor's constitutes unfair competition that is actionable under section 43(a) of the Lanham Act." Vision Sports, Inc. v. Melville, Corp., 888 F.2d 609, 613 (9th Cir. 1989). "Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." Id. More specifically, "[t]rade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" Clicks Billiards v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir. 2001) (quoting Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993)).

To sustain a claim for trade dress infringement, a plaintiff must prove: "(1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary

meaning;[12] and (3) that the defendant's product or service creates a likelihood of consumer confusion." <u>Clicks</u>, 251 F.3d at 1258 (internal footnotes omitted).

### 1. Functionality

Trade dress protection extends only to design features that are nonfunctional.  As the Supreme Court explained, "A product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." <u>Qualitex Co. v. Jacobson Prods. Co., Inc.</u>, 514 U.S. 159, 165 (1995).  "The fact that individual elements of the trade dress may be functional does not mean that the trade dress as a *whole* is functional; rather, 'functional elements that are separately unprotectable can be protected together as part of a trade dress." <u>Clicks</u>, 251 F.3d at 1259 (quoting <u>Fuddruckers, Inc. v. Doc's B.R. Others</u>, Inc., 826 F.2d 837, 842 (9th Cir. 1987))

---

[12]   In <u>Wal-Mart Stores, Inc. v. Samara Bros., Inc.</u>, the United States Supreme Court held that where the plaintiff is claiming infringement of trade dress for product packaging, the plaintiff may show that the packaging is either inherently distinctive *or* has acquired a secondary meaning.  529 U.S. 205, 214-15 (2000).  However, the Court stated that where the plaintiff is claiming infringement of trade dress for product design, the plaintiff *must* show that the design has acquired secondary meaning. <u>Id.</u> at 215.  The Court acknowledged that it is not easy to differentiate between product design and product packaging trade dress, however, it held that "the frequency and difficulty of having to distinguish between product design and product packaging will be much less than the frequency and difficulty of having to decide when a product design is inherently distinctive.  To the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring [a showing of] secondary meaning." <u>Id.</u>

(emphasis in original). "Trade dress is the composite tapestry of visual effects. Courts have repeatedly cautioned that, in trademark-and especially trade dress-cases, the mark must be examined as a whole, not by its individual constituent parts." Clicks, 251 F.3d at 1259; see also 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8.2 (4th ed. 2000) ("[T]he issue is not whether the defendant's package or trade dress is identical to the plaintiff's in each and every particular. Rather, it is the similarity of the *total* overall impression that is to be tested . . .") (emphasis in original).

To determine whether a product's feature is functional, the court considers several factors: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998).

Plaintiff sufficiently establishes, for purposes of a preliminary injunction motion, that the trade dress of its MUSCLE MILK® RTD nutritional product, examined in its entirety, is non-functional. Defendant argues that plaintiff's packaging is functional because there are limited types of packaging that have been approved by the FDA for RTD nutritional products. While plaintiff cannot claim a monopoly in use of the Tetra Pak packaging or "snowman"-shaped plastic bottles, it can, however, "claim as its [trade dress] the particular combination and arrangement of design elements that distinguish it from others

41

using the same" packaging.  Id. (internal quotations omitted).

Considering the first of the Disc Golf factors, the court finds that plaintiff's design does not yield utilitarian advantages.  While RTD nutritional products are commonly packaged in Tetra Pak packaging, the specific design elements of plaintiff's trade dress do not "affect the cost or quality of the article."  Qualitex Co., 514 U.S. at 165.  For example, the font and size of plaintiff's lettering, the strategic placement of the colored swirl, and the use of the term MUSCLE MILK® is not essential to the use or purpose of RTD nutritional products in general.  Second, alternative designs are available, as is apparent from a cursory glance at the RTD nutritional products offered by competitors within the industry.  Promax®, EAS®, and MRI® all offer RTD nutritional products that, while manufactured in the Tetra Pak packaging, contain unique names and design elements that distinguish their products from that designed by plaintiff.  (White Decl., Ex. I; Owoc Decl., ¶ 27.)  Third, plaintiff's advertising does not tout the utilitarian advantages of plaintiff's design.  Fourth, plaintiff's design is the result of a comparatively simple and inexpensive method of manufacture.  To produce the Tetra Pak packaging, a company provides artwork to the packaging company, which in turn prints the artwork on the outside of a continuous role of Prisma material, which is used to create the packaging/labels.  (Owoc Decl., ¶ 14.)  Further, plaintiff and defendant both sell their RTD nutritional products for between $3.00 and $5.00, and thus the design cannot be the result of an expensive method of manufacture.  (PI, ¶ 8; Owoc Decl., ¶ 30.)

Taking all of these factors into consideration, it does not appear that plaintiff's design of the packaging in which its RTD nutritional product is sold is functional.  Although the individual design elements of plaintiff's trade dress may serve as functional elements (such as the Tetra Pak packaging and the colored swirl identifying the flavor of the product), the focus of the functionality inquiry is upon "the overall visual impression that the combination and arrangement of those elements create."  Clicks, 251 F.3d at 1259.  Considering plaintiff's Tetra Pak RTD nutritional product in whole, the court finds that plaintiff has sufficiently shown that its product's design is non-functional.

## 2.   Secondary Meaning

"The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source."  Fuddruckers, 826 F.2d at 843.  "'[T]he elements making up the alleged trade dress must have been used in such a manner as to denote product source.  Thus, a product feature whose only impact is decorative and aesthetic, with no source-identifying role, cannot be given exclusive rights under trade dress law.'"  Clicks, 251 F.3d at 1262 (quoting 1 McCarthy § 8:1).  Prima facie evidence of the development of secondary meaning is established where a mark has been continuously and exclusively used for a period of five years.  Secular Org. For Sobriety Inc., v. Ulrich, 213 F.3d 1125, 1130 (9th Cir. 2000) (citing 15 U.S.C. § 1052(f)); see also Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985) (holding that the plaintiff bears the burden of showing that its design obtained

secondary meaning before the defendant commenced its allegedly infringing activities).

"A plaintiff may establish secondary meaning through direct and circumstantial evidence." Continental Lab. Products, Inc. v. Medax Intern., Inc., 114 F. Supp. 2d 992, 999 (9th Cir. 2000). "Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning." Levi Strauss, 778 F.2d at 1358. Secondary meaning may also be established through circumstantial evidence such as "exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market." Continental Lab., 114 F. Supp. 2d at 1000 (citing Filipino Yellow Pages v. Asian Journal Publications, 198 F.3d 1143, 1151 (9th Cir. 1999)).

Even if the court were to disregard, as defendant requests, plaintiff's evidence of actual customer confusion,[13] the court would nonetheless find that plaintiff has adequately shown that its trade dress has acquired secondary meaning. Plaintiff has exclusively marketed its Tetra Pak RTD nutritional product, with its corresponding trade dress, since November 2004.[14] (PI, ¶ 8.) Further, plaintiff submits evidence that it has spent tens of millions of dollars promoting and advertising the MUSCLE MILK® RTD nutritional product, as well as over $100 million promoting

---

[13] However, for the reasons set forth above, the court does not exclude this evidence, and it provides further evidence of secondary meaning. See 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15.11 (4th ed. 2000)

[14] In its reply to defendant's opposition, however, plaintiff states that it introduced its Tetra Pak RTD nutritional product into the market in the first quarter of 2004.

44

the MUSCLE MILK® brand in general. (<u>Id.</u> at ¶ 14.) Plaintiff also proffers evidence that the MUSCLE MILK® products have been financially successful, with sales growing significantly since introduction, and that plaintiff's MUSCLE MILK® RTD nutritional product is the best selling RTD liquid protein nutritional supplement on the market. (PI, ¶ 3; White Decl., ¶¶ 6-7.) In light of the significant circumstantial evidence presented by plaintiff, the court finds that plaintiff is likely to succeed in showing that the public associates plaintiff's trade dress with the MUSCLE MILK® brand. Accordingly, the court finds that plaintiff has sufficiently shown a likelihood of demonstrating that the trade dress of its MUSCLE MILK® RTD nutritional product has attained a secondary meaning.[15]

### 3. Likelihood of Consumer Confusion

For the same reasons as discussed above under plaintiff's trademark infringement claim, the court likewise finds that CS has demonstrated a likelihood of confusion with respect to VPX's use of a trade dress confusingly similar to plaintiff's.

In sum, for all of the above reasons, plaintiff has also shown a likelihood of success in proving its trade dress infringement claim.

---

[15] In light of the Supreme Court's ruling in <u>Wal Mart</u>, 529 U.S. at 215, out of an abundance of caution, this court interpreted plaintiff's trade dress infringement action as a dispute regarding plaintiff's product design, rather than product packaging. Since plaintiff must show under <u>Wal Mart</u> that its product design has acquired a secondary meaning (which it has sufficiently established), rather than any type of inherent distinctiveness, the court need not address the issue of whether plaintiff's trade dress is inherently distinctive.

45

## II.  **Irreparable Harm**

To be entitled to injunctive relief, it is not sufficient
that plaintiff demonstrate a likelihood of success on the merits
of its claims.  Plaintiff must also demonstrate a likelihood that
absent the injunction, it will be irreparably harmed by
defendant's alleged infringing conduct.  <u>Winter</u>, 129 S. Ct. at
375-76; <u>Volkswagen AG</u>, 2009 WL 928130 at *6 (recognizing that the
standard under <u>Winter</u> requires that a plaintiff "demonstrate, by
the introduction of admissible evidence and with a clear
likelihood of success that the harm is real, imminent and
significant, not just speculative or potential").  In trademark
cases, courts have found irreparable harm in the loss of control
of a business' reputation, a loss of trade and loss of goodwill.
<u>Opticians Ass'n of Am. v. Indep. Opticians of Am.</u>, 920 F.2d 187,
195 (3rd Cir. 1990).  Trademarks serve as the identity of their
owners and in them resides the reputation and goodwill of their
owners.  Thus, if another person infringes the marks, that person
borrows the owner's reputation, whose quality no longer lies
within the owner's control.  <u>Id.</u>  A trademark owner's loss of the
ability to control its marks, thus, creates the potential for
damage to its reputation.  <u>Id.</u> at 196.  "Potential damage to
reputation constitutes irreparable injury for the purpose of
granting a preliminary injunction in a trademark case." <u>Id.</u>; <u>see
also</u> <u>Apple Computer, Inc. v. Formula Int'l Inc.</u>, 725 F.2d 521,
526 (9th Cir. 1984) (finding irreparable injury where "district
court could reasonably have concluded that continuing
infringement would result in loss of control over Apple's
reputation and loss of good will").

Here, plaintiff submits evidence to establish a likelihood that if VPX continues to flood the marketplace with its MUSCLE POWER® products and advertising, it will cause CS irreparable harm because these activities prevent CS from controlling the reputation of its highly recognizable and valuable MUSCLE MILK® brand. Moreover, CS has established a strong likelihood that if VPX's products are allowed to remain in the marketplace, it will be extremely difficult for CS to maintain and restore its goodwill among customers, some of whom are already being confused by defendant's products. (White Decl., ¶ 44.)

The court finds that CS has shown that VPX's MUSCLE POWER® mark and trade dress so closely resemble the MUSCLE MILK® mark and trade dress, especially when viewed in the marketplace, that CS has likely lost some control over its reputation in the market. As a result, VPX's ongoing use of its MUSCLE POWER® mark and trade dress is likely to confuse consumers, thereby causing CS substantial and irreparable harm. Accordingly, plaintiff has also established this required element for injunctive relief.

## III. **Balance of Equities**

As set forth above, the damage CS will suffer if VPX is allowed to continue making unauthorized use of a mark and trade dress that are confusingly similar to CS's MUSCLE MILK® trademark and trade dress is significant and irreparable. While the court acknowledges that VPX will sustain some appreciable damage upon issuance of the requested injunction, in that it will have to pull and dispose of its current inventory which cannot be repackaged due to FDA regulations and it will take at least six months for VPX to get a new label and packaging for its RTD

47

protein product (see Owoc Decl., ¶ 38), the damage to CS is more substantial. Ultimately, the requested injunction does not preclude VPX from engaging in its normal business activities, including manufacturing, promoting and selling a competing RTD protein product. Rather, the injunction only asks that VPX refrain from using a mark and trade dress for its products which is confusingly similar to CS's trademark and trade dress.

## IV. **Public Interest**

Contrary to defendant's protestations, there is no strong public interest that weighs against the proposed injunctive relief. In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused. See e.g. Moroccanoil, Inc. V. Moroccan Gold, LLC, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2009); Davidoff v. CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001) (noting the public interest is served by avoiding confusion in the marketplace). "When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation." Bellsouth Advertising & Publishing Corp. v. The Real Color Pages, Inc., 792 F. Supp. 775, 785 (M.D. Fla. 1991). In light of the court's findings on likelihood of confusion above, the court concludes that the public interest also weighs in favor of granting an injunction in this case.

## V. **Bond**

Federal Rule of Civil Procedure 65©) provides, in pertinent part: "The court may issue a preliminary injunction . . . only if

48

the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Defendant requests the court require plaintiff to post a bond in the amount of $5 million dollars. However, defendant offers no financial analysis or documentary evidence to support a bond in this amount. Indeed, other than its President and CEO's statement that issuance of an injunction will require VPX to "destroy over one hundred thousand dollars in packaging/labels and product in our inventory" (see Owoc Decl., ¶ 39), VPX does not provide any specific evidence of the financial losses it will sustain if the injunction is ultimately found to have been erroneously entered. As a result, plaintiff asks the court to impose only a nominal bond of $50,000.00.

However, considering that VPX will be forced to pull its current inventory and dispose of it, as the product cannot be re-packaged due to FDA regulations, and that it will take at least six months for VPX to get its product on the market with a new mark and packaging (see id. at ¶ 38), the court, in its discretion, orders a bond of $500,000.00.

### CONCLUSION

Having reviewed the motion, supporting and opposing memoranda and supporting affidavits and exhibits submitted by the parties, and the oral argument of counsel, the court finds and concludes as follows:

1. Plaintiff is likely to succeed on the merits of its trademark and trade dress infringement claims against VPX.

49

2. There is a strong likelihood that plaintiff will suffer irreparable harm if the preliminary injunction is not issued. Given the actual and likely confusion between plaintiff's MUSCLE MILK® product and VPX's MUSCLE POWER® product, plaintiff is likely to be irreparably harmed through loss of goodwill and reputation.

3. Moreover, VPX has many other options for trademarks and trade dress of its product, the product has been on the market for a relatively short period, and VPX could make changes to the product name and packaging to prevent consumer confusion. Accordingly, it would be less of a hardship on VPX to change its product name and packaging than plaintiff would suffer if the court were to deny the motion.

4. After consideration, the court believes that a corporate bond in the amount of $500,000.00 will be sufficient security in the event that the preliminary injunction is ultimately determined to have been entered wrongfully.

Based upon these findings of the court, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and good cause appearing, IT IS HEREBY ORDERED as follows:

1. That VPX and its officers, agents, servants, employees and attorneys, and anyone acting in concert or participation with them, are PRELIMINARILY ENJOINED from marketing, selling, advertising, or promoting a liquid protein-based nutritional supplement using the name MUSCLE POWER.

2.  That VPX and its officers, agents, servants, employees and attorneys, and anyone acting in concert or participation with them, are PRELIMINARILY ENJOINED from marketing, selling, advertising, or promoting a liquid protein-based nutritional supplement using any trademark confusingly similar to the MUSCLE MILK® trademark in connection with any of the following features:

    a.  An octagonal-shaped Tetra Pak package wherein:

        I.   The package front is visually divided into three sections, top, middle, and bottom.

        ii.  On the middle portion of the package, the word MUSCLE is prominently displayed above the word POWER in all capital letters in a bold, block-letter, white-colored font on a dark background.

        iii. On the lower portion of the package a depiction of a swirled colored liquid appears reflecting the color of the product in the package, i.e., brown for chocolate, red for strawberries and cream, etc.

        iv.  On the top portion of the package, an identification of the flavor in words and a picture.

        v.   On the side of the package, the words MUSCLE POWER printed in bold, block-letter font and oriented so the consumer can read the words from the bottom to the top of the package.

3. That VPX and its officers, agents, servants, employees and attorneys, and anyone acting in concert or participation with them, are PRELIMINARILY ENJOINED from marketing, selling, advertising, or promoting a liquid protein-based nutritional supplement using any name or mark other than MUSCLE POWER that is confusingly similar to the name MUSCLE MILK.

4. That VPX and its officers, agents, servants, employees and attorneys, and anyone acting in concert or participation with them, are PRELIMINARILY ENJOINED from marketing, selling, advertising, or promoting a liquid protein-based nutritional supplement using trade dress that is confusingly similar to the trade dress associated with MUSCLE MILK.

    a. The MUSCLE MILK trade dress includes an octagonal Tetra Pak package with the following features:

        I. The package front is visually divided into three sections, top, middle, and bottom.

        ii. On the middle portion of the package, the word MUSCLE is prominently displayed above the word MILK in all capital letters in a bold, block-letter, white-colored font on a dark background.

        iii. On the lower portion of the package a depiction of a swirled colored liquid appears reflecting the color of the product in the package, i.e., brown for chocolate, red for strawberries and cream, etc.

iv.   On the top portion of the package, the flavor of the product is identified.

v.   On the side of the package, the words MUSCLE MILK® are printed in bold, block-letter font and oriented so the consumer can read the words from the bottom to the top of the package.

5. Plaintiff shall post a corporate bond in the amount of $500,000.00 within 5 business days of the date of this order.

IT IS SO ORDERED.

DATED: May 6, 2009

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE