ALAN J. DROSTE [SBN 105616]
adroste@kpdlex.com
KING PARRET & DROSTE LLP
450 Newport Center Drive, Suite 500
Newport Beach, CA 92660
Telephone: (949) 644-3484
Facsimile: (949) 644-3993

KALINA PAGANO *(pro hac vice)*
kpagano@vpxsports.com
VICTORIA N. GODWIN *(pro hac vice)*
vickeyg@vpxsports.com
VITAL PHARMACEUTICALS, INC.
1600 North Park Drive
Weston, FL 33326
Telephone: (954) 641-0570
Facsimile: (954) 389-6254

Attorneys for Vital Pharmaceuticals, Inc.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CYTOSPORT, INC.,

Plaintiff,

v.

VITAL PHARMACEUTICALS, INC.,

Defendant.

AND COUNTERCLAIM.

Case No. 2:08-cv-02632-JAM-GGH

DECLARATION OF ROBERT L. KLEIN IN SUPPORT OF VITAL PHARMACEUTICALS, INC.'S OPPOSITION TO (1) CYTO'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS ASSERTED IN ITS COMPLAINT (DE 195) AND (2) CYTO'S MOTION TO EXCLUDE THE TESTIMONY OF ROBERT L. KLEIN (DE 196)

Filed Concurrently with:
1. VPX's Opposition to Cyto's Motion for Summary Judgment on its Fifth, Sixth, Seventh and Eighth Causes of Action;

2. VPX's Opposition to Cyto's Motion to Exclude the Testimony of Robert L. Klein

Before: Hon. John A. Mendez
Date: August 8, 2012
Time: 9:30 a.m.
Courtroom: 6

I, Robert Klein, declare as follows:

1. I have been designated by Vital Pharmaceuticals, Inc. ("VPX") as an expert witness in this case filed by CytoSport, Inc. ("Cyto").

2. I have been deposed by Cyto on two separate occasions as an expert in this matter, the first on April 21, 2009 and the second on May 23, 2012.

3. I received a Bachelor of Science degree in Mechanical Engineering in 1966 from the Massachusetts Institute of Technology, Cambridge, Massachusetts, and a Master of Science degree in 1968 from the MIT Sloan School of Management. I am currently the president and co-founder of Applied Marketing Science, Inc. ("AMS") a market research and consulting firm with offices in Waltham, Massachusetts. For four years I was a member of the Proof of Confusion Subcommittee of the International Trademark Association, and I am currently a member of the Oppositions and Cancelations Subcommittee. I am also a member of the Product Development and Management Association, the Institute for Operations Research and Management Science, and I am a Certified Product Development Professional. I have been creating and conducting consumer surveys since 1970 and have been accepted by Courts all over the United States as an expert in consumer perception surveys. (See a copy of my CV attached to my reports included in the Jessen Declaration as Exhibits B and R – D.E. 195-2).

4. I understand that Cyto has made various claims against VPX in its Third Amended Complaint ("TAC"). Among other things, Cyto has raised claims concerning trademark and trade dress infringement.

5. It is my understanding that to prevail on claims of trademark and trade dress infringement Cyto must set forth evidence of a likelihood of confusion.

6. Surveys are, by definition and necessity, somewhat of an artificial environment. Typically consumers are not asked survey questions in the middle of shopping. Replicating "marketplace conditions" does not mean "build a store for customers to shop in." Rather, it means providing a sufficiently "real enough" stimulus so that the consumer's response can be reasonably attributed to the stimulus used. Surveys with written descriptions of products are frequently used, for example, in conjoint analysis surveys to establish the value of an infringing feature in a patent

dispute. Telephone and internet surveys have been widely used in Lanham Act cases. Some venues have their own particular preferences. For example, the default for surveys for the Trademark Trial and Appeal Board ("TTAB") is to show the word mark in all caps on a white card with the product category below it in smaller letters.

7. I am aware of a survey conducted by Hal Poret ("Poret") on behalf of Cyto for this case.

8. I am aware of a report written and submitted by Poret where he concludes based upon his survey that there is a likelihood of confusion between the Muscle Milk and Muscle Power products.

9. I have written a report in rebuttal to Poret's report, pointing out flaws in the survey conducted by Poret, including (a) the fact that the sample selected by Poret was overly broad and contained an insufficient number of potential customers of Muscle Power, (b) the stimulus used was not representative of what customers would encounter in the market, (c) the research design did not properly reflect the marketplace realities in terms of how the products would be encountered in stores, and (d) the large number of interviewer errors suggests inadequate interviewer training and supervision. (Attached to the Jessen Declaration as Exhibit B – D.E. 195-2, is a copy of my April 17, 2009 Rebuttal Report.)

10. My original rebuttal report includes the findings from one of the two surveys that I conducted in this matter. My first survey, conducted in 2009, was an internet survey. It tested to see if Poret's definition and use of the phrase "Protein Drinks" was appropriate when attempting to select the participants and respondents for his survey who would be likely consumers of the Muscle Power product. From my survey results, I have concluded that Poret's sample was overly broad and in turn caused respondents who were not qualified to participate in his survey. When formulating and carrying out the internet survey, I employed all of the accepted procedures and principles within the industry of consumer surveys.

11. My second survey was conducted at the end of 2010, as a mall intercept survey. I created and conducted an Eveready-type survey to test the likelihood of confusion between the Muscle Milk and Muscle Power products. The "Eveready" format was selected after discussing

the case with VPX's counsel and weighing the pros and cons of the types of surveys that are used in the testing of likelihood of confusion and the variations thereof. An Eveready-type survey is common and appropriate in the cases of trademark infringement, when the senior mark is well known within the relevant sample population. When formulating and carrying out the survey, I employed all of the accepted procedures and principles within the industry of consumer surveys.

12. The single stimulus or "Eveready" design is often referred to as the "gold standard"[1] in situations where the senior user is well known. "In cases involving strong marks, the Eveready test should be considered the gold standard for fundamental cognitive and marketing reasons."[2] It is my understanding that, two years later, Muscle Milk is the market leader in the high-protein nutritional shakes market and that it is a "strong mark." My criticisms of the Poret survey were directed at the design he used, not at all of the possible designs he could have used.

13. The survey I created and conducted to test the likelihood of confusion was not a replication of Poret's survey. I was not attempting to correct the flaws found within his survey. My survey was a wholly different yet appropriate survey to test the issue of likelihood of confusion. However, if I had been asked to conduct a survey that would have corrected those flaws found in the Poret survey, I could have done so (but not within the short time available for a rebuttal in 2009).

14. My survey conducted to test the issue of likelihood of confusion between Muscle Milk and Muscle Power led me to opine that there is negligible likelihood of confusion about the source of the Muscle Power product. Using an "Eveready" survey design, 4.1% of respondents (9 of 221) who were shown Muscle Power believed that it was put out by Cyto or by the company that puts out Muscle Milk. To control for guessing and other forms of noise, a separate group of respondents was shown Protein Rush and asked the same questions. After subtracting the results in the control group, the "net" confusion was 1.3% (4.1% in the test group minus 2.8% in the control group). This result is clearly *de minimis* and cannot support a finding of likelihood of confusion.

[1] McCarthy on Trademarks and Unfair Competition, §32:173.50 quoting J.B. Swann, Likelihood of Confusion Studies and the Straightened Scope of Squirt, 98 Trademark Rptr 739, 746 (2008).

[2] J.B. Swann, Likelihood of Confusion Studies and the Straightened Scope of Squirt, 98 Trademark Rptr 739, 746 (2008)

(Attached to the Jessen Declaration as Exhibit R – D.E. 195-2, is a copy of my February 14, 2011 Report, which was resubmitted for the record on December 15, 2011)

15. It is my understanding that Cyto has now submitted a motion to have my testimony excluded by raising issues such as the appropriateness of the Eveready Survey, my alleged failure to replicate marketplace conditions, my alleged failure to consider consumers' awareness of Muscle Milk, my alleged lack of consideration of respondents who may have thought they were looking at Muscle Milk when they were looking at Muscle Power, and my alleged failure to test for Sponsorship Confusion. I will address each of these points below.

16. As stated above, an Eveready design is clearly appropriate when the senior user's mark is well known. My previous argument and criticism were directed at the survey Poret conducted not at all the other formats he could have used. The category I surveyed "high protein nutritional shakes" is narrower than the category definition Poret used ("protein drinks") and it is my understanding that Muscle Milk is the market leader in this more narrowly defined category.

17. If the Eveready design is the "gold standard" then replicating marketplace conditions cannot be very important if the Eveready processes are followed. My critique of the Poret survey was that if you are going to show both products, then show them together. I did not say that this was the only way to do a survey. The right survey design depends on the specific issue of the case at the time the survey is conducted. I judged that in 2011, Muscle Milk was well known enough that an "Eveready" design was appropriate.

18. Furthermore, while Cyto may not be well known as a company (just as Union Carbide was not well known as the parent of Eveready batteries), Muscle Milk was, by the end of 2010 and beginning of 2011, a well-known product, and if consumers believed that the company that put out Muscle Power was the same company that put out Muscle Milk, they could have easily supplied that answer. Few did. Even if only half the people in the survey were aware of Muscle Milk (hard to believe, but hypothetically) this assumption would serve only to double the small level of confusion measured – from 1.3% to 2.6% -- and still not near any level that would be probative of likelihood of confusion.

19. Cyto's argument that respondents who were shown Muscle Power thought they were looking at Muscle Milk is mere speculation, with no basis in any data I collected or Poret collected. There is no basis other than speculation to assert that respondents think they are looking at Muscle Milk when they are looking at a product clearly labeled Muscle Power. Milk and Power are two distinct words.

20. I did not test for Sponsorship Confusion. Such a test was not appropriate. High protein nutritional shakes are not the type of product that is "sponsored" or "endorsed" by another company, and the confusion alleged by Cyto is source confusion. If questions about sponsorship or endorsement had been added, the answer would have been athletes or sports leagues (e.g. "the official drink of the World Weightlifting Association"). The question would have been nonsensical and the answers meaningless.

21. Also, to respond to Cyto's misguided theory of my surveys' having been "regularly" criticized by Courts, that argument is wholly irrelevant. Those few cases concerned different issues and different types of surveys, as addressed below.

22. Avocados Plus, Incorporated, et al. v. Mike Hohanns, et al., Case No. 02-1798, DC, False Advertising (2005 Report and deposition): The task I was given was to show whether or not consumers believed that advertisements for Mexican Hass Avocado ads were put out by the U.S. Government. This was, in fact, the truth, and this was the evidence that the attorney who retained me said he needed. The survey clearly showed that no one would attribute the ads to the U.S. government. The government's position (Mike Hohanns was the Secretary of Agriculture), however, was that in order for consumers to be misled, they must attribute the ads to the specific growers who brought the suit. It's a very different question than the one I researched. As an additional complication, the attorney who retained me did not comply with court order to turn over documents.

23. Board of Regents, University of Texas v. KST Electric, Ltd., Civil Action No. A06CA950 LY, W.D. of Texas, Austin Division, Secondary Meaning (2007 Report and deposition): The survey was designed to measure the "fame" of the "longhorn" mark. As the stimulus I used the "longhorn" mark which is registered with the USPTO by the University for a

wide variety of goods and which is used in many different ways. Sometimes the mark is orange, sometimes white, and sometimes there is no color at all. I used the mark as registered which was an uncolored outline of the longhorn mark. The Judge Magistrate agreed with the conclusion of my survey that the Texas Longhorn mark was not famous (and did not qualify for dilution protection) outside of the State of Texas. But in his criticism he mistook me for a different expert in a case I was not involved with. This was the Indianapolis Colts case quoting Judge Posner, a case which took place long before I had ever served as an expert witness. I have written the judge to get the record corrected, but have received no reply.

24. ComponentOne, LLC v. ComponentArt, Inc. et al., Civil Action Number: 05-1122, W. D. of Pennsylvania, Trademark Confusion (2007 Report and deposition): The survey tested the specific type of confusion that the plaintiff was concerned about. My survey focused on that specific situation, but the judge ruled that there were other situations in which a different stimulus would produce a different result.

25. Makers Mark Distillery, Inc. v. Diageo North America, Inc. et al., Civil Act. No. 3:03 CV-93-H, W.D. of Kentucky at Louisville, Trademark confusion (2009 Report, deposition and testimony): the judge did not believe that an Internet survey was appropriate for the universe being surveyed, but any other method would have been prohibitively expensive because it was necessary to screen over 25,000 potential respondents. And as is clear from the written decision, my testimony obviously did not do a good job of explaining to the judge how a test vs. control experimental design worked or how it should be analyzed. An additional complication was that Maker's Mark changed its claim shortly before trial to include the color of the "dripping wax seal" and my control stimulus could not take that into account. Finally, this judge repeated the Judge Posner remark from the U of T case that did not involve me. I have written him as well to try to get this corrected, but have had no response. It should be noted that the judge enjoined Jose Cuervo (my client) from doing something they hadn't done in 4 years (used a red dripping wax seal) and awarded no damages because there was no evidence of any confusion which is exactly what my survey showed.

26. Steak Umm Co. v Steak 'Em Up, Inc., Civil Action No. 09-2857, E.D. of Pennsylvania: The format used in my survey tracked the format accepted by the TTAB (although this was not a TTAB case.) The defendant's mark was shown in block letters on a white background because it was shown in many different ways in the marketplace and the sound of the name, not just its appearance, was alleged to be confusingly similar to the plaintiff's name. The judge disagreed with my client's fundamental theory of confusion which meant that many responses to the survey questions asked were not relevant to the issues on which the case ultimately turned.

I declare under penalty of perjury under the laws of the United State that the foregoing is true and correct. Dated: July 25, 2012.

Robert L. Klein

CERTIFICATE OF SERVICE

I, Victoria N. Godwin, hereby certify and declare as follows:

1. I am over the age of 18 years and am not a party to the within cause. I am employed in the Broward County, State of Florida.

2. My business address is 1600 North Park Drive, Weston, Florida 33326.

3. On July 25, 2012, I served a true copy of the attached document titled exactly:

DECLARATION OF ROBERT L. KLEIN IN SUPPORT OF VITAL PHARMACEUTICALS, INC.'S OPPOSITION TO (1) CYTO'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS ASSERTED IN ITS COMPLAINT (DE 195) AND (2) CYTO'S MOTION TO EXLUDE THE TESTIMONY OF ROBERT L. KLEIN (DE 196)

by filing through the CM/ECF system and thereby causing it to be served via electronic mail to all persons appearing on the docket sheet to receive service in this case, as listed below:

Glenn W. Peterson <gpeterson@mpwlaw.net>
MILLSTONE, PETERSON & WATTS, LLP
2267 Lava Ridge Court,
Suite 210
Roseville, CA 95661
Telephone: (916) 780-8222
Facsimile: (916) 780-8775

Plaintiff/Counter-Defendant, CytoSport, Inc.

Peter M. de Jonge <dejonge@tnw.com>
Jed H. Hansen <hansen@tnw.com>
THORPE NORTH & WESTERN, L.L.P
8180 South 700 East, Suite 350
Sandy, UT 84070
Telephone: (801) 566-6633
Facsimile: (801) 566-0750

Plaintiff/Counter-Defendant, CytoSport, Inc.

Mark M. Bettilyon <mbettilyon@RQN.COM >
Sam C. Straight <sstraight@RQN.COM>
RAY QUINNEY & NEBEKER, PC
36 South State Street, Suite 1400
Salt Lake City, UT 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543

Plaintiff/Counter-Defendant, CytoSport, Inc.

George Charles Nierlich, III <cnierlich@gibsondunn.com>
Joshua Aaron Jessen <jjessen@gibsondunn.com>
Gibson, Dunn and Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: 415-393-8239
Facsimile: 415-374-8486

Plaintiff/Counterclaim-Defendant, CytoSport, Inc.

Kalina Pagano <kpagano@vpxsports.com>
Vital Pharmaceuticals, Inc.
1600 North Park Drive
Weston, FL 33326

Co-Counsel for Defendant/Counterclaimant

Alan Droste < adroste@kpdlex.com>
King Parrent & Droste LLP
450 Newport Center Drive, Suite 500
Newport Beach, CA 92660

Co-Counsel for Defendant/Counterclaimant

I certify and declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of July, 2012, in Weston, Florida.

/S/ *Victoria N. Godwin*
Victoria N. Godwin
<vickeyg@vpxsports.com>
Telephone: 954-641-0570 (ext 296)